The basis for this interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is the district court’s denial of a motion to compel arbitration of a contractual dispute among three insurers. We consider en banc whether the MeCarran-Ferguson Act[1] authorizes state law to reverse-preempt the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention)[2] or its implementing legislation (Convention Act).[3] We conclude that it does not. We vacate the district court’s order and remand for further proceedings.
I
Louisiana Safety Association of Timber-men-Self Insurers Fund (LSAT) is, as its name implies, a self-insurance fund operating in Louisiana. It provides workers’ compensation insurance for its members. Certain Underwriters at Lloyd’s, London (the Underwriters) provided excess insurance to LSAT by reinsuring claims for occupational-injury occurrences that exceeded the amount of LSAT’s self-insurance retention. Each reinsurance agreement contained an arbitration provision.
Safety National Casualty Corporation (Safety National) also provides excess workers’ compensation coverage and alleges that in a loss portfolio transfer agreement, LSAT assigned its rights under the reinsurance agreements with the Underwriters to Safety National. The Underwriters refused to recognize the assignment, contending that LSAT’s obligations were strictly personal and therefore nonassignable.
Safety National sued the Underwriters in federal district court. The Underwriters filed an unopposed motion to stay proceedings and compel arbitration. The district court initially granted that motion.
The Underwriters commenced arbitration proceedings with Safety National and LSAT; however, the parties could not agree upon how arbitrators were to be selected. The Underwriters then filed a motion to lift the stay in order to join LSAT as a party in the district court and to compel arbitration to resolve how to compose the arbitration panel. In response, LSAT moved to intervene, lift the stay, and quash arbitration. LSAT asserted that the arbitration agreements were unenforceable under Louisiana law.
While those motions were pending, the Underwriters filed a separate action against Safety National and LSAT seeking recovery of unpaid premiums under the policies. The district court consolidated the two actions.
The district court ultimately reconsidered its initial decision and granted LSAT’s motion to quash arbitration. The district court concluded that although the Convention would otherwise require arbitration, a Louisiana statute[4] that has been interpreted to prohibit arbitration agreements in insurance contracts was controlling and reverse-preempted the Convention because of the MeCarran-Ferguson *718 Act.[5] The district court subsequently certified that the order embodying its rulings involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal pursuant to 28 U.S.C. § 1292(b) may materially advance the termination of the litigation. A panel of this court concluded that the McCarran-Ferguson Act did not cause the Louisiana statute under consideration to reverse-preempt the Convention or the Convention Act.[6] Rehearing en banc was granted, thereby vacating the panel opinion.[7] Because the McCarranFerguson Act does not apply to the Convention, we vacate the district court’s order and remand for further proceedings consistent with this opinion.
II
The Underwriters raise three issues: whether (1) the Convention is an “Act of Congress” within the meaning of the McCarran-Ferguson Act,[8] (2) the McCarran-Ferguson Act applies to international commercial transactions, and (3) the Convention takes precedence over the McCarran-Ferguson Act even if the latter applies to international transactions. Because our resolution of the first issue resolves the question presented in this interlocutory appeal, we do not reach the other issues pressed by the Underwriters. We are persuaded that state law does not reverse-preempt federal law in the present case for two related but distinct reasons: (1) Congress did not intend to include a treaty within the scope of an “Act of Congress” when it used those words in the McCarran-Ferguson Act, and (2) in this case, it is when we construe a treaty — specifically, the Convention, rather than the Convention Act — to determine the parties’ respective rights and obligations, that the state law at issue is superseded.
The starting point of our inquiry is the statutory and treaty texts.[9] Here, the texts of the Convention, the Convention Act, and the McCarran-Ferguson Act support the conclusion that the McCarranFerguson Act does not authorize Louisiana to reverse-preempt the Convention by means of contrary legislation prohibiting arbitration of disputes regarding contracts of insurance.
The Louisiana statute at issue provides:
A. No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state ... shall contain any condition, stipulation, or agreement:
*719 (2) Depriving the courts of this state of the jurisdiction of action against the insurer.
C. Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract.[10]
Although it is not clear from this provision’s text that arbitration agreements are voided, Louisiana courts have held that such agreements are unenforceable because of this statute.[11]
The Louisiana statute, as so interpreted, conflicts with the United States’s commitments under the Convention. The Convention states that each signatory nation “shall recognize an agreement in writing under which the parties undertake to submit to arbitration” their dispute “concerning a subject matter capable of settlement by arbitration.”[12] The Convention contemplates enforcement in a signatory nation’s courts, directing that courts “shall” compel arbitration when requested by a party to an international arbitration agreement, subject to certain exceptions not at issue in the present case:
The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.[13]
This treaty is the subject of the Convention Act. That Act states that the Convention “shall be enforced in United States courts in accordance with this chapter.”[14] The Act additionally provides relevant definitions[15] and establishes federal court jurisdiction and venue.[16] The parties agree that requiring arbitration of the present dispute in compliance with the Convention would contravene the Louisiana statute.
LSAT contends that the McCarran-Ferguson Act resolves this conflict in favor of the application of state law because the Louisiana statute regulates the business of insurance. The MeCarranFerguson Act provides that “Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.”[17] *720 The Act further provides, “No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance .... ”[18] The McCarran-Ferguson Act thus allows state law to reverse-preempt an otherwise applicable federal statute because the McCarran-Ferguson Act does not permit an “Act of Congress” to be “construed to invalidate, impair, or supersede” state law unless the Act of Congress “specifically relates to the business of insurance.”
For the purposes of the McCarran-Ferguson Act, neither the Convention nor the Convention Act specifically relates to the business of insurance. Nor do the Underwriters challenge the district court’s conclusion that Louisiana Revised Statutes § 22:868, when applied to disputes arising under reinsurance agreements between insurers, regulates the business of insurance within the meaning of the McCarran-Ferguson Act.[19] Accordingly, we will assume, without deciding, that the Louisiana statute regulates the business of insurance,[20] although the matter is not entirely free from doubt.[21] We, therefore, limit our analysis to whether Louisiana law over *721 rides the Convention’s requirement that the present dispute be submitted to arbitration because we construe an act of Congress to invalidate, impair, or supersede state law.
Ill
LSAT contends that the Convention was not self-executing and could only have effect in the courts of this country when Congress passed enabling legislation. Accordingly, LSAT argues that the Convention’s enabling legislation is an “Act of Congress” within the meaning of the McCarran-Ferguson Act’s provision that “[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance .... ”[22] LSAT reasons that the Convention has no effect independent of legislation enabling it and that the McCarranFerguson Act requires us to construe the Convention’s enabling legislation as reverse-preempted by the Louisiana statute. LSAT concedes, however, that if the Convention is self-executing, it would be a treaty and not an Act of Congress within the meaning of the McCarran-Ferguson Act.
The Underwriters addressed whether the Convention is self-executing only in briefs to the panel and not in any depth, instead maintaining primarily that even if the Convention were not self-executing, once implemented, it remains a treaty and is not an “Act of Congress” within the meaning of the McCarran-Ferguson Act.
It is unclear to us whether the Convention is self-executing. The Supreme Court’s recent decision in Medellín v. Texas[23] instructs that “[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text.”[24] In Medellín, the Court examined the Vienna Convention on Consular Relations[25] and the Optional Protocol Concerning the Compulsory Settle *722 ment of Disputes to the Vienna Convention[26] to determine whether a judgment of the International Court of Justice (ICJ) was “directly enforceable as domestic law in a state court in the United States.”[27] Considering the obligations imposed by Article 94 of the United Nations Charter in regard to those treaties, the Court concluded that it “does not provide that the United States ‘shall’ or ‘must’ comply with an ICJ decision, nor indicate that the Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts.”[28]
Applying the reasoning of the Supreme Court in Medellin, we are to consider what the Convention says about its legal effect in domestic courts. The Convention expressly states that domestic courts “shall” compel arbitration when requested by a party to an international arbitration agreement.[29] The Convention additionally sets forth limited procedures to be followed in obtaining enforcement of an arbitration award.[30] However, the Supreme Court indicated in dicta in Medellin that at least the provisions of the Convention pertaining to the enforcement of judgments of international arbitration tribunals are not self-executing.[31] This reference in Medellin could be read to imply that the Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court’s opinion.
Even if the Convention required legislation to implement some or all of its provisions in United States courts, that does not mean that Congress intended an “Act of Congress,” as that phrase is used in the McCarran-Ferguson Act, to encompass a non-self-executing treaty that has been implemented by congressional legislation. Implementing legislation that does not conflict with or override a treaty[32] does *723 not replace or displace that treaty.[33] A treaty remains an international agreement or contract negotiated by the Executive Branch and ratified by the Senate,[34] not by Congress. The fact that a treaty is implemented by Congress does not mean that it ceases to be a treaty and becomes an “Act of Congress.”
To accept LSAT’s argument, we must conclude that when Congress used “Act of Congress” in the McCarran-Ferguson Act, it intended that phrase to exclude self-executing treaty provisions but to include treaty provisions that are implemented by federal legislation. This is untenable. The commonly understood meaning of an “Act of Congress” does not include a “treaty,” even if the treaty required implementing legislation. As noted above, LSAT concedes that if the provisions in the Convention directing courts to enforce international arbitration agreements were self-executing, then the McCarran-Ferguson Act would have no preemptive effect because self-executing treaties are not an “Act of Congress.” Yet, there is no apparent reason — and LSAT has provided no rationale — why Congress would have chosen to distinguish in the McCarran-Ferguson Act between treaty provisions that are self-executing and those that are not self-executing but have been implemented.[35] We do not consider it reasonable to construe the term “Act of Congress” in the McCarran-Ferguson Act as an indication *724 of congressional intent to permit state law to preempt implemented, non-self-exeeuting treaty provisions but not to preempt self-executing treaty provisions.
Our conclusion that Congress did not intend the term “Act of Congress,” as used in tibie McCarran-Ferguson Act, to reach a treaty such as the Convention is buttressed by the terms of the Convention Act. When Congress amended the FAA in 1970 to include provisions that dealt with the Convention, it provided in 9 U.S.C. § 203, that “[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.” This is a direct indication that Congress thought that for jurisdictional purposes, an action falling under the Convention arose not only under the laws of the United States but also under treaties of the United States. Accordingly, even in the very act of Congress that was arguably necessary to implement the Convention in domestic courts, Congress recognized that jurisdiction over actions to enforce rights under the Convention did not arise solely under an “Act of Congress.”
Equally important in the present case, it is a treaty (the Convention), not an act of Congress (the Convention Act), that we construe to supersede Louisiana law.[36] The Convention Act states that the Convention “shall be enforced in United States courts in accordance with this chapter.”[37] The Convention Act defines when an arbitration agreement “falls under the Convention”- — -principally when it is “commercial” and does not “aris[e] out of ... a [legal] relationship which is entirely between citizens of the United States ... unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.”[38] The Convention Act provides United States courts with jurisdiction over “[a]n action or proceeding falling under the Convention ... regardless of the amount in controversy.”[39] But the Convention Act does not in this case operate without reference to the contents of the Convention. It is the Convention under which legal agreements “fall”;[40] it is an action or proceeding-under the Convention that provides the court with jurisdiction;[41] such an action or proceeding is “deemed to arise under the *725 laws and treaties” of the United States,[42] the treaty in this case being the Convention; and when chapter 1 of title 9 (the FAA) conflicts with the Convention, the Convention applies.[43]
The Convention Act directs us to the treaty it implemented, and when we “construe” the Convention, we are faced with the possibility of “superseding” the Louisiana law. The Convention requires that each signatory nation “shall recognize an agreement in writing under which the parties undertake to submit to arbitration” their dispute “concerning a subject matter capable of settlement by arbitration,”[44] and provides for direct enforcement in a signatory nation’s courts, which “when seized of [a covered] action ... shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null or void, inoperative or incapable of being performed.”[45] The Convention itself contains defenses to the enforceability of an arbitration agreement by requiring that it is “in writing,” regulates a “subject matter capable of settlement by arbitration,” and is not “null and void, inoperative or incapable of being performed.”[46] Accordingly, it is by reference to the Convention that we have a command — a judicially enforceable remedy— that we “supersede” Louisiana law unless there are defenses set forth in the Convention that counteract that command. Because here the Convention, an implemented treaty, rather than the Convention Act, supersedes state law, the MeCarran-Ferguson Act’s provision that “no Act of Congress” shall be construed to supersede state law regulating the business of insurance is inapplicable.
IV
The dissent contends that an implemented non-self-executing treaty is not a treaty within the meaning of the Supremacy Clause and cannot preempt state law. With great respect, none of the Supreme Court decisions cited in the dissenting opinion so hold.[47]
*726 The dissent quotes from the Ninth Circuit’s decision in Hopson v. Kreps,[48] without providing the context of the quoted passages.[49] The Ninth Circuit observed in that case that an implementing statute should be given its plain meaning even if that interpretation conflicts with the treaty it implements.[50] The Ninth Circuit did not hold that an implemented treaty has no independent significance, as the dissent implies.[51]
The dissent relies on a “consensus of legal scholars” regarding the status of implemented non-self-exeeuting treaties.[52] This “consensus” consists of one or two sentences in publications of relatively recent vintage, most of which provide no analysis or citation of authority. The Restatement (Third) of the Foreign Relations Law of the United States § 111, comment h (1987), is the earliest scholarly source cited by the dissent. The Reporter for that Restatement was Professor Louis Henkin, arguably an advocate for the enforcement of implemented treaty provisions.[53]
*727 Our court has exhibited an understanding that implemented provisions of a non-self-executing treaty can themselves be given effect by the courts as federal law.[54] The dissent concludes that we used “imprecise language” in each of these cases.[55] To the extent that is true, we note that the Supreme Court has used language similar to that which the dissent labels “imprecise.”[56]
However, we need not and do not undertake to determine the precise or technical contours of how or whether implemented non-self-executing treaty provisions become the “Law of the Land” under the Supremacy Clause. Our task in the present case is to determine if, in enacting the McCarran-Ferguson Act, Congress intended for state law to reverse-preempt federal law that has as its source an implemented non-self-executing treaty.
V
There is precedent that at the time of the McCarran-Ferguson Act’s enactment, courts analyzed treaties, even when imple *728 merited by an Act of Congress, as treaties. The Supreme Court’s decision in Missouri v. Holland[57] reflects that a treaty followed by implementing legislation remains a treaty that, where relevant, is viewed as distinct from an Act of Congress. The United States had consummated a non-self-executing treaty with Great Britain to protect migratory birds.[58] An act was passed giving effect to this treaty, directing the Secretary of Agriculture to promulgate regulations and prohibiting the killing of migratory birds except as permitted by regulations compatible with the treaty.[59] The State of Missouri sought to prohibit the enforcement of this Act and the Secretary’s regulations, arguing that the statute interfered with rights reserved to the states by the Tenth Amendment.[60] The Court observed that “[a]n earlier act of Congress that attempted by itself and not in pursuance of a treaty to regulate the killing of migratory birds within the States had been held bad.”[61] The Supreme Court, however, recognized a difference between acts of Congress under the Commerce Clause and “a treaty followed by such an act,” as authorized pursuant to the Necessary and Proper Clause.[62] The validity of the implementing legislation under the Necessary and Proper Clause turned on the constitutionality of the treaty — even though it was implemented by an Act of Congress. The Court said,
[w]hether the two cases cited [holding the prior Acts of Congress “bad”] were decided rightly or not they cannot be accepted as a test of the treaty power. Acts of Congress are the supreme law of the land only when made in pursuance of the Constitution, while treaties are declared to be so when made under the authority of the United States.[63]
The Court continued,
[w]e do not mean to imply that there are no qualifications to the treaty-making power; but they must be ascertained in a different way. It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could [64]
The Court assumed that “but for the treaty the State would be free to regulate [migratory birds within its boundaries] itself.”[65] But the Court explained, “[v]alid treaties of course are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States.”[66] The Court continued, “[n]o doubt the great body of private relations usually fall within the control of the State, but a treaty may override its power.”[67] Because the treaty was constitutional, the Supreme Court ultimately concluded “that the treaty and statute must be upheld.”[68] The Supreme Court decided Holland in 1920, so when Congress passed *729 the McCarran-Ferguson Act two decades later (and the Convention Act half a century later), it was well aware that a treaty, even if requiring implementation, was distinct from an Act of Congress and could serve as the source of authority to “override [a state’s] power.”[69]
We think it unlikely that when Congress crafted the McCarran-Ferguson Act, it intended any future treaty implemented by an Act of Congress to be abrogated to the extent that the treaty conflicted in some way with a state law regulating the business of insurance if Congress’s implementing legislation did not expressly save the treaty from reverse-preemption by state law. If this had been Congress’s intent, it seems probable that Congress would have included a term such as “or any treaty requiring congressional implementation” following “Act of Congress” and “such Act” in the McCarran-Ferguson Act.[70] There is no indication in the McCarranFerguson Act that Congress intended, through the preemption provision and the use of the term “Act of Congress,” to restrict the United States’ ability to negotiate and implement fully a treaty that, through its application to a broad range of international agreements, affects some aspect of international insurance agreements.[71]
*730 VI
Our conclusion that referral to arbitration is proper in this case is bolstered by the eongressionally sanctioned national policy favoring arbitration of international commercial agreements. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,[72] the Supreme Court considered the “arbitrability, pursuant to the Federal Arbitration Act and the [Convention], of claims arising under the Sherman Act and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.”[73] The Court held such claims were arbitrable.[74] It emphasized that “[a]s international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade.”[75] The Court admonished:
If they are to take a central place in the international legal order, national courts will need to “shake off the old judicial hostility to arbitration,” and also then-customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at least, it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration.[76]
In the process, the Supreme Court explained that “not ... all controversies implicating statutory rights are suitable for arbitration.”[77] In determining which are not, the Court said,
“[j]ust as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable.”[78]
The Supreme Court explained that federal antitrust law did not show such a congressional intent. Importantly, the Court said, “[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.”[79] We discern no such deducible intent in the MeCarran-Ferguson Act.
Although the MeCarran-Ferguson Act embodies a strong policy that the states have an interest in the regulation of the business of insurance, concerns that a state’s regulatory policies regarding such contracts may not be recognized in an international arbitration are ameliorated by the substantive provisions in the Convention and are not a basis for refusing to require that an arbitration go forward. As the Supreme Court observed in Mitsubishi with regard to the substance of federal antitrust law, “[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportu *731 nity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed.”[80] The same is true of substantive Louisiana law that applies to the reinsurance agreements presently at issue.
VII
We are aware that our decision conflicts with that of the Second Circuit in Stephens v. American International Insurance Co.[81] That case held that “the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation.”[82] The Second Circuit concluded that Congress’s “implementing legislation [did] not preempt”[83] a Kentucky statute that “subordinated” all “choice of law or arbitration provisions” in a contract to which an insolvent insurer in liquidation proceedings was a party.[84] The court reasoned that “when the terms of [a treaty] import a contract — when either of the parties engage[s] to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court.”[85] The court then quoted the “[n]o Act of Congress” provision in the McCarran-Ferguson Act and said, “[a]ccordingly, the implementing legislation does not preempt the Kentucky Liquidation Act.”[86]
We agree, of course, that when provisions of a treaty are not self-executing, they cannot be enforced in a court in this country unless and until those provisions are implemented by Congress. But, we submit, this does not answer the question of what Congress intended when it used the terms “[n]o Act of Congress” and “such Act” in the McCarran-Ferguson Act or why Congress would have addressed only treaties that required implementation by Congress. The text of the McCarranFerguson Act does not support the inclusion by implication of “a treaty implemented by an Act of Congress.” Because we give the phrases “Act of Congress” and “such Act” their usual, commonly understood meaning, we conclude that implemented treaty provisions, self-executing or not, are not reverse-preempted by state law pursuant to the McCarran-Ferguson Act. We find no indication from the text of the McCarran-Ferguson Act that Congress intended to signal a distinction between self-executing and non-self-executing-but-implemented treaties in the McCarran-Ferguson’s reverse-preemption clause.
We also note that the reasoning of the Second Circuit in Stephens v. American International Insurance Co. is at least in tension with that of its subsequent decision in Stephens v. National Distillers & Chemical Corp.,[87] in which the Second Circuit held that the McCarran-Ferguson Act did not cause a state law requiring out-of-state insurers to post security before participating in court proceedings to preempt *732 the Foreign Sovereign Immunities Act.[88] In support of its first alternative ground for that holding, the Second Circuit reasoned that it must “apply federal law to the insurance industry, in spite' of the McCarran-Ferguson Act, whenever federal law clearly intends to displace all state laws to the contrary.”[89] The McCarranFerguson Act does not “force a federal law that clearly intends to preempt all other state laws to give way simply because the insurance industry is involved.”[90] In a footnote appended to this statement, the court concluded that because an additional, alternate ground (that international law preempted the state insurance law before the passage of both the McCarran-Ferguson Act and the Federal Sovereign Immunities Act) supported its holding, it “need not consider whether [its decision to apply federal law when it was clearly intended to displace all state law] is in conflict with the holding in [Stephens v.] American [International Insurance Co.].”[91]
In sum, the McCarran-Ferguson Act does not cause Louisiana Revised Statutes § 22:868 to reverse-preempt the Convention with regard to the dispute before us.
VIII
We finally consider Safety National’s request that we affirm the district court’s ruling that the rights under the policies are assignable. The order embodying that ruling, dated August 13, 2003, has not been certified by the district court under 28 U.S.C. § 1292(b). We therefore lack appellate jurisdiction to consider it.[92]
We VACATE the district court’s order denying the motion to compel arbitration and REMAND for further proceedings consistent with this opinion.

. 15 U.S.C. §§ 1011-1115.

. June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

. Pub.L. No. 91-368, 84 Stat. 692 (1970) (codified at 9 U.S.C. §§ 201-208).

. La.Rev.Stat. Ann. § 22:868 (previously La. Rev.Stat. Ann. § 22:629).

. See generally U.S. Dep’t of Treasury v. Fabe, 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) ("Ordinarily, a federal law supersedes any inconsistent state law. The first clause of [15 U.S.C. § 1012(b)] reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.").

. Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd’s, London, 543 F.3d 744 (5th Cir.2008), vacated and reh’g en banc granted, 558 F.3d 599 (5th Cir.2009).

. Safety Nat’l Cas. Corp. v. Certain Underwriters at Lloyd’s, London, 558 F.3d 599 (5th Cir.2009).

. 15 U.S.C. § 1012(b).

. See Medellín v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 1357, 170 L.Ed.2d 190 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.”); Consumer Prod. Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself.”).

. La.Rev.Stat. Ann. § 22:868.

. See Doucet v. Dental Health Plans Mgmt. Corp., 412 So.2d 1383, 1384 (La.1982) ("Classification of the contract at issue as an insurance contract renders the arbitration provisions of that contract unenforceable under [Louisiana Revised Statutes § 22:868].”); see also McDermott Int'l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir.1997) ("Compulsory arbitration clauses in certain insurance contracts are unenforceable in Louisiana because of [Louisiana Revised Statutes § 22:868] ....”); accord W. of Eng. Ship Owners Mut. Ins. Ass’n (Luxembourg) v. Am. Marine Corp., 981 F.2d 749, 750 n. 5 (5th Cir.1993) ("Louisiana has prohibited arbitration clauses in insurance policies” (citing La. Rev.Stat. Ann. § 22:868; Doucet, 412 So.2d at 1384)).

. Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

. Id. art. II(3).

. 9 U.S.C. § 201.

. Id. § 202.

. Id. § 203-04.

. 15 U.S.C. § 1011.

. Id. § 1012(b); U.S. Dept. of Treasury v. Fabe, 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (explaining that the first clause of [§ 1012(b)] mandates that state statutes "regulating the business of insurance” do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise).

. 15 U.S.C. § 1012(b).

. See Fabe, 508 U.S. at 505, 113 S.Ct. 2202 ("The broad category of laws enacted 'for the purpose of regulating the business of insurance[1] consists of laws that possess the ‘end, intention, or aim’ of adjusting, managing, or controlling the business of insurance .... [T]he actual performance of an insurance contract is an essential part of the ‘business of insurance.' ") (citation omitted).

. One of the criteria for determining whether a law regulates the business of insurance is whether it has the effect of spreading or transferring a policyholder's risk. See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (explaining that the "three criteria relevant in determining whether a particular practice is part of the 'business of insurance’ ” include "whether the practice has the effect of transferring or spreading a policyholder's risk,” although "[n]one of these three criteria is necessarily determinative in itself”); cf. Ky. Ass’n of Health Plans, Inc. v. Miller, 538 U.S. 329, 338, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) (explaining, albeit in the context of ERISA, "that conditions on the right to engage in the business of insurance must also substantially affect the risk pooling arrangement between the insurer and the insured”). An argument could be made that, at least in theory, resolving claims in an arbitration rather than in a court or potentially before a jury does not substantially affect the risk pooling arrangement between the insurer and the insured. The Supreme Court has emphasized that arbitration agreements are forum-selection provisions and do not displace substantive rights afforded by a statute or other substantive law. See, e.g., Preston v. Ferrer, 552 U.S. 346, 128 S.Ct. 978, 987, 169 L.Ed.2d 917 (2008) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral ... forum.” (omission in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985))); cf. Int'l Ins. Co. v. Duryee, 96 F.3d 837, 839-40 (6th Cir.1996) (holding that a state statute revoking an insurer's license to do business if it exercised its right to remove a suit to federal court was not saved from preemption by the McCarran-Ferguson Act because the state statute "was not enacted so much 'for the purpose of regulating the business of insurance' as for the parochial purpose of regulating a foreign insurer's choice of forum and punishing the insurer for going into federal court”). However, in emphasizing that arbitration agreements generally should be enforced to preserve the parties' selection of the arbitral forum without regard to state laws mandating a judicial forum, the *721 Supreme Court has said, "the [Federal Arbitration Act, 9 U.S.C. § 1 et seq. (‘FAA’)] not only 'declared a national policy favoring arbitration,’ but actually 'withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 56, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (quoting Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)).
It could also be argued that prohibiting the enforcement of arbitration agreements in contracts between an insurer and a reinsurer is not “necessary” to "protect policyholders,” see generally Garcia v. Island Program Designer, Inc., 4 F.3d 57, 62 (1st Cir.1993) (discussing Fabe and holding that Puerto Rico's filing deadline for proofs of claims against an insolvent insurance company did not regulate the business of insurance within the meaning of the McCarran-Ferguson Act because "it is neither directed at, nor necessary for, the protection of policyholders”), and that, at least in this context, the Louisiana statute’s "connection to the ultimate aim of insurance is too tenuous,” see Fabe, 508 U.S. at 509, 113 S.Ct. 2202 ("The preferences conferred upon employees and other general creditors ... do not escape pre-emption [by federal law] because their connection to the ultimate aim of insurance is too tenuous.”).
We note that this court held in American Bankers Insurance Co. of Florida v. Inman, 436 F.3d 490 (5th Cir.2006), that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA”), was reverse-preempted by the McCarran-Ferguson Act in the context of a dispute between an injured insured and his insurer regarding underinsured-motorist coverage governed by Mississippi law. We have no occasion to reconsider that holding today. The issue has not been presented in this appeal.

. 15 U.S.C. § 1012(b).

. 552 U.S. 491, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).

. Id. at 1357.

. Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

. Apr. 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487.

. Medellín, 128 S.Ct. at 1353. The United States had agreed to submit disputes arising out of the Vienna Convention to the ICJ, but the Supreme Court recognized that "submitting to jurisdiction and agreeing to be bound are two different things.” Id. at 1358. The Court observed that the Optional Protocol "says nothing about the effect of an ICJ decision and does not itself commit signatories to comply with an ICJ judgment.” Id.

. Id. at 1358.

. Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(3), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

. See id. arts. III, IV.

. See Medellín, 128 S.Ct. at 1366 ("Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes. The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress, [citing 9 U.S.C. §§ 201-208] ... Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result.” (citation omitted)); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (observing, although refusing to decide whether the Convention was self-executing, "Congress passed Chapter 2 of the United States Arbitration Act in order to implement the Convention” (citation omitted)).

. The later-in-time rule applies to resolve a conflict between a treaty and a statute. See Egle v. Egle, 715 F.2d 999, 1013 (5th Cir.1983) ("Under our Constitution, treaties and statutes are equal in dignity. If a treaty and a statute are inconsistent, 'the one last in date will control the other ....’” (omission in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888))); see also Medellín, 128 S.Ct. at 1359 n. 5 ("[A] later-in-time federal statute supersedes inconsistent treaty provisions.”); Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam) (" ‘[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty *723 null.’ ” (quoting Reid v. Covert, 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion))).

. See United States v. Percheman, 32 U.S. 51, 89, 7 Pet. 51, 8 L.Ed. 604 (1833) ("[The] understanding of the article [of the treaty] must enter into our construction of the acts of [C]ongress on the subject.’’).

. See U.S. Const, art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur____”).

. Congress does not appear to distinguish between self-executing and implemented, non-self-executing treaties when using the term "treaty” in a generally applicable sense, as shown by various statutes that were promulgated in the era when the McCarran-Ferguson Act was enacted. See Revenue Act of 1941, Pub.L. No. 77-250, sec. 109, 55 Stat. 687, 695 (1941) (amending certain provisions of the Internal Revenue Code to exclude the application of those sections to residents of certain countries "so long as there is in effect with such country a treaty which provides otherwise”); Farm Labor Supply Appropriation Act, Pub.L. No. 78-229, sec. 3, 58 Stat. 11, 13 (1944) (authorizing the War Food Administrator to enter into agreements with agricultural extension services of State colleges to furnish certain services to domestic interstate and foreign agricultural workers and to "require the modification or termination of any agreement with any such extension service whenever he finds such action to be necessary in order to carry out the terms of any treaty or international agreement to which the United States of America is signatory”)-
In other federal statutes that are currently in effect, it does not appear that Congress has used the term "treaty” to exclude implemented non-self-executing treaties. As an example, in our immigration laws, the term “immigrant” "means every alien except ... an alien entitled to enter into the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national ....” 8 U.S.C. § 1101 (a)(l5)(E). This provision would not seem to exclude a treaty that is non-self-executing but that has been implemented by an Act of Congress.
It would seem that "treaty” would include all implemented treaties, regardless of whether they were self-executing or had required implementing legislation. Yet, if we were to conclude that implemented non-self-executing treaties can be nothing more than an "Act of Congress,” then none of the references to a "treaty” or "treaties” in the enactments we have discussed would include implemented, non-self-executing treaties. This is not a reasonable construction of these enactments.

. Cf. Humana Inc. v. Forsyth, 525 U.S. 299, 307-10, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (defining "to invalidate" to mean "to render ineffective, generally without providing a replacement rule or law”; "to impair” to mean "[t]o weaken, to make worse, to lessen in power, dimmish, or relax, or otherwise affect in an injurious manner”; and "to supercede” to mean "to displace (and thus render ineffective) while providing a substitute rule” (citations omitted)).

. 9 U.S.C. § 201.

. Id. § 202. There is no doubt that the present dispute among three insurers arises out of legal relationships that are commercial. We are not called upon to explore the outer bounds of what "commercial” legal relationships may encompass.

. Id. § 203. LSAT does not argue that this jurisdictional statute, or other jurisdictional statutes such as 28 U.S.C. § 1331, invalidates, impairs, or supersedes Louisiana’s law. We look skeptically on a claim that the McCarran-Ferguson Act intended to deny diversity jurisdiction or federal question jurisdiction to federal courts in the state of Louisiana. See Grimes v. Crown Life Ins. Co., 857 F.2d 699, 702-03 (10th Cir.1988).

. 9 U.S.C. § 202; see also id. § 205 ("Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant ... may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States____”).

. Id. § 203.

. Id. (emphasis added).

. Id. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.”).

. Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

. Id. art. II(3).

. Id. art. II(1), (3). Plaintiffs have not raised various defenses to arbitrability that are available under the Convention. For example, the Supreme Court noted that "Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve ‘subject matter capable of settlement by arbitration,' contemplates exceptions to arbitrability grounded in domestic law.” Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639 n. 21, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). "Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope.” Id. "Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention.” Id. But the Court "decline[d] to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so." Id. (emphasis added).

. The single phrase from the Supreme Court's decision in Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888), on which the dissent relies, post at 739, n. 11, cannot bear the weight assigned to it. The dissent quotes a passage from Whitney: "[w]hen [a treaty and legislation] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating *726 ihe language of either; but, if the two are inconsistent, the one last in date will control the other; provided, always, the stipulation of the treaty on the subject is self-executing." Id. at 194, 8 S.Ct. 456 (emphasis added). The Court was discussing the well-recognized principle of law that when a treaty and legislation passed by Congress conflict, the latter in time controls. The phrase italicized by the dissent only emphasizes that in tire context of the sentence containing the phrase, the Court was referring to a self-executing treaty because a non-self-executing treaty that cannot be judicially enforced cannot override a statute. The discussion in Whitney does not consider whether an implemented non-self-executing treaty may supersede prior legislation, just as a self-executing treaty may.
Similarly, the dissent lifts quotations from Edye v. Robertson (Head-Money Cases), 112 U.S. 580, 598-99, 5 S.Ct. 247, 28 L.Ed. 798 (1884), out of context. The Supreme Court held only that Congress may, through subsequent legislation, supersede a treaty that has "become the subject of judicial cognizance in the courts of this country.” Id. at 599, 5 S.Ct. 247.

. 622 F.2d 1375 (9th Cir.1980).

. Post at 743.

. Hopson, 622 F.2d at 1380 ("Thus, where courts have been persuaded as to the proper interpretation of an implementing statute, that judgment [regarding the intended meaning of the terms of the statute] has not been affected by the claim that the reading given the statute was inconsistent with the intent of the parties to the treaty.”).

. The dissent additionally cites, post at 743-44, the concurring opinion in Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 879 (D.C.Cir.2006) (Kavanaugh, J., concurring) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 111 cmt. h (1987) ("Strictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States.”)). The majority opinion in Fund for Animals, Inc. held that if legislation conflicts with a treaty it implements, the implementing legislation controls. 472 F.3d at 879.

. Post at 741-42.

. A discussion of self-executing and non-self-executing treaties appears in at least two of Professor Henkin's publications, L. Henkin, Foreign Affairs and the United States Constitution, 198-204 (2d ed.1996); L. Henkin, Foreign Affairs and the United States Constitution, 156-161 (1972). A footnote in the former contains the "[s]trictly” sentence that appears in comment h of the Restatement. L. Henkin, Foreign Affairs and the United States Constitution, 200 n* (2d ed. 1996). However, he wrote immediately following that sentence that "[sjometimes the implementing legislation gives the treaty itself legal effect or incorporates it by reference.” Id. Professor Hen-kin also opined;
The difference between self-executing and non-self-executing treaties is commonly misunderstood. Whether a treaty is self-executing or not, it is legally binding on the United States. Whether it is self-executing or not, it is supreme law of the land. If it is not self-executing, Marshall said, it is not "a *727 rule for the court”; he did not suggest that it is not law for the President or for Congress. It is their obligation to see to it that it is faithfully implemented; it is their obligation to do what is necessary to make it a rule for the courts if the treaty requires that it be a rule for the courts, or if making it a rule for the courts is a necessary or a proper means for the United States to carry out its obligation.
Id. at 203-04.

. See Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 902-03 (5th Cir.2005) ("It goes without saying that, upon the United States signing a treaty and Congress adopting enabling legislation, the treaty becomes the supreme law of the land." (emphasis added)); McDermott Int’l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir.1997) (refusing to decide “whether the Convention preempts La. R.S. 22:629” (emphasis added)); Sedco, Inc. v. Petroleos Mexicanos Mexican Nat’l Oil Co., 767 F.2d 1140, 1145 (5th Cir.1985) (holding that if an arbitration agreement qualifies, "the Convention requires district courts to order arbitration” (emphasis added)). Thus, "[b]ecause the United States is a signatory to the Convention, and Congress enacted enabling legislation, the Convention is applicable as federal law in this case.” Lim, 404 F.3d at 903 (emphasis added).

. Post at 743-44.

. In common parlance, an implemented non-self-executing treaty provision can be "enforced” as the law of the land, and a non-self-executing treaty provision can become "domestic law” when implemented. The Supreme Court itself expressed these concepts in Medellín v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 1356, 170 L.Ed.2d 190 (2008), although the precise question of whether an implemented treaty or its implementing legislation or both are given effect under the Supremacy Clause was not at issue. In Medellin, the Supreme Court said, "[w]hen, in contrast, '[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect.’ ” Id. (alteration in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888)). This indicates that in speaking of even non-self-executing treaties, it is commonly thought that treaty stipulations can themselves be enforced once implemented by legislation. Similarly, the Supreme Court said, "[i]n sum, while treaties 'may comprise international commitments ... they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing” and is ratified on these terms.’ " Id. (citation omitted) (emphasis added). Here again, this statement exhibits a commonly-held conception that a treaty provision can itself become domestic law once implemented. See also id. at 1356 n. 2 ("Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress.”); id. ("[N]one of these treaty sources creates binding federal law in the absence of implementing legislation ....”); id. at 1369 (recognizing "two means ... for giving domestic effect to an international treaty obligation under the Constitution,” which are the making of a self-executing treaty and the implementation of a non-self-executing treaty).

. 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

. Id. at 431, 40 S.Ct. 382.

. Id. at 431-32, 40 S.Ct. 382.

. Id. at 430-31, 40 S.Ct. 382.

. Id. at 432, 40 S.Ct. 382.

. Id. at 433, 40 S.Ct. 382.

. Id.

. Id.

. Id. at 434, 40 S.Ct. 382.

. Id. (citations and internal quotation marks omitted).

. Id.

. Id. at 435, 40 S.Ct. 382.

. Id. at 434, 40 S.Ct. 382.

. 15 U.S.C. § 1012(b).

. Cf. Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). In American Insurance Association v. Garamendi, the Supreme Court considered whether a state law, aimed at aiding Holocaust victims by requiring insurers to disclose information about insurance policies sold in Europe before and during World War II, interfered with the federal government’s conduct of foreign relations. Id. at 401, 123 S.Ct. 2374. The President had entered into an executive agreement with Germany’s chancellor in which the United States agreed that whenever a German company was sued in an American court regarding a Holocaust-era claim, the United States government would submit a statement that adjudicating such a claim was against the United States' “foreign policy interests.’’ Id. at 406, 123 S.Ct. 2374. The Supreme Court observed that “[gjenerally, ... valid executive agreements are fit to preempt state law, just as treaties are, and if the agreements here had expressly preempted laws like [California’s law], the issue would be straightforward.” Id. at 416-17, 123 S.Ct. 2374 (footnote omitted). Because an implied conflict existed, the Court ultimately concluded that the state law was preempted. Id. at 420-27, 123 S.Ct. 2374. In addressing California’s argument that in the McCarran-Ferguson Act "Congress authorized state laws of [the] sort [California had enacted],” the Court said,
As the text itself makes clear, the point of McCarran-Ferguson’s legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised .... [A] federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.
Id. at 427-28, 123 S.Ct. 2374. Although addressing an executive agreement, not a treaty, the Court’s holding is nonetheless relevant here. The Court signaled that the McCarranFerguson Act is focused on “implied preemption by domestic commerce legislation,” not executive conduct in consummating foreign agreements. Of course, in this case, we are dealing with the President’s treaty-making authority, the Senate’s treaty-approval authority, and Congress’s authority to implement or facilitate such a treaty pursuant to the Necessary and Proper Clause. See U.S. Const. art. II, § 2, cl. 2 (“[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur .... ”); Missouri v. Holland, 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920) ("If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government.”).

. 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

. Id. at 616, 105 S.Ct. 3346 (citations omitted).

. Id. at 626-27, 105 S.Ct. 3346.

. Id. at 638, 105 S.Ct. 3346.

. Id. at 638-39, 105 S.Ct. 3346 (quoting Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 985 (2d Cir.1942)).

. Id. at 627, 105 S.Ct. 3346.

. Id. (emphasis added).

. Id. at 628, 105 S.Ct. 3346.

. Id. at 638, 105 S.Ct. 3346. The Court observed that "[wjhile the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them.” Id.

. 66 F.3d 41 (2d Cir.1995).

. Id. at 45.

. Id.

. Id. at 43.

. Id. at 45.

. Id.

. 69 F.3d 1226 (2d Cir.1995).

. Id. at 1231.

. Id. at 1233.

. Id.

. Id. at 1233 n. 6.

. See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) ("The court of appeals may not reach beyond the certified order to address other orders made in the case.”).

. "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." Ashwander v. Tenn. Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Although this principle is commonly invoked as the canon of avoidance in statutory construction, see Clark v. Martinez, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (describing the canon as "a tool for choosing between competing plausible interpretations of a statutory text”), courts, including this one, have also interpreted treaties to avoid constitutional questions. See, e.g., Parretti v. United States, 122 F.3d 758, 769 (9th Cir.1997), rev'd en hanc on other grounds, 143 F.3d 508 (9th Cir.1998) (en banc); Caltagirone v. Grant, 629 F.2d 739, 747-48 (2d Cir.1980); cf. Hidalgo County Water Control and Improvement Dist. No. 7 v. Hedrick, 226 F.2d 1, 6-7 (5th Cir.1955) ("‘We should seek to *733 avoid, if possible, a decision adjudging a treaty to be in conflict with the Constitution. It is not necessary to a decision in this case for us to pass upon the question of whether the treaty is violative of the prohibitions of the Federal Constitution, as we would be compelled to do if the treaty required the construction contended for by Appellants.'" (quoting Amaya v. Stanolind Oil & Gas Co., 158 F.2d 554, 557 (5th Cir.1946))).