**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ESAB GROUP, INCORPORATED,

       *Plaintiff-Appellant,*

       v.

ZURICH INSURANCE PLC,

       *Defendant-Appellee,*

       and

ARROWOOD INDEMNITY COMPANY;
LIBERTY MUTUAL INSURANCE
COMPANY; TRYGG-HANSA
FORSAKRINGS AB; ZURICH
INSURANCE COMPANY,

       *Defendants.*

No. 11-1243

ESAB GROUP, INCORPORATED,

　　　　　*Plaintiff-Appellee,*

　　　　　v.

ZURICH INSURANCE PLC,

　　　　　*Defendant-Appellant,*

　　　　　and　　　　　　　　　　No. 11-1655

ARROWOOD INDEMNITY COMPANY;
LIBERTY MUTUAL INSURANCE
COMPANY; TRYGG-HANSA
FORSAKRINGS AB; ZURICH
INSURANCE COMPANY,

　　　　　*Defendants.*

Appeals from the United States District Court
for the District of South Carolina, at Florence.
Thomas E. Rogers, III, United States Magistrate Judge.
(4:09-cv-01701-TER)

Argued: May 17, 2012

Decided: July 9, 2012

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Wilkinson and Judge Diaz concurred. Judge Wilkinson wrote a separate concurring opinion.

**COUNSEL**

**ARGUED:** Mark William Mosier, COVINGTON & BURLING, LLP, Washington, D.C., for Appellant/Cross-Appellee. Richard Mancino, WILLKIE, FARR & GALLAGHER, LLP, New York, New York, for Appellee/Cross-Appellant. **ON BRIEF:** Andrew A. Ruffino, COVINGTON & BURLING LLP, New York, New York; Mark W. Buyck, Jr., WILLCOX, BUYCK & WILLIAMS, PA, Florence, South Carolina; William F. Greaney, COVINGTON & BURLING, LLP, Washington, D.C., for Appellant/Cross-Appellee. J. Boone Aiken, III, AIKEN, BRIDGES, ELLIOTT, TYLER & SALEEBY, PA, LLP, Florence South Carolina; Benjamin P. McCallen, WILLKIE, FARR & GALLAGHER, LLP, New York, New York; Joseph G. Davis, WILLKIE, FARR & GALLAGHER, LLP, Washington, D.C., for Appellee/Cross-Appellant.

---

**OPINION**

FLOYD, Circuit Judge:

The Supreme Court has long recognized the importance of preserving the United States' ability to "speak with one voice" in regulating foreign commerce. *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976); *see also Japan Line, Ltd. v. Cnty. of L.A.*, 441 U.S. 434, 448–49 & n.14 (1979). Appellant/Cross-Appellee ESAB Group, Inc., urges us to allow the various views of the states to replace the federal government's singular voice regarding commercial arbitration of insurance disputes in foreign tribunals. Specifically, ESAB Group contends that South Carolina law "reverse preempts" federal law—namely, a treaty and its implementing legislation—pursuant to the McCarran-Ferguson Act, a federal statute directed at protecting state insurance regulations from implied preemption by federal domestic commerce legislation. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 428

(2003). We find such a reading of the pertinent law untenable. For this reason, we affirm as to the district court's exercise of subject-matter jurisdiction, and we find no error in the district court's order compelling arbitration.[1]

We likewise reject the arguments of Appellee/Cross-Appellant Zurich Insurance plc (ZIP) that the district court erred in exercising personal jurisdiction over it and in remanding nonarbitrable claims to state court. Finding both parties' appeals to be without merit, we affirm.

I.

This appeal presents a complex question regarding the intersection of a treaty and federal and state statutory law. For this reason, we first provide an overview of the applicable law before discussing the factual background.

A.

In 1944, to the shock of observers and commentators, the Supreme Court held that insurance was subject to federal regulation under the interstate commerce clause. *See United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 552–53 (1944). "Prior to that decision, it had been assumed . . . that the issuance of an insurance policy was not a transaction in interstate commerce and that the States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538–39 (1978). Accordingly, the likelihood developed that, through implied preemption, federal statutes enacted to govern domestic commerce would oust states from insurance regulation.

In 1945, in response to *South-Eastern Underwriters*, Congress enacted the McCarran-Ferguson Act, 15 U.S.C.

---

[1]A magistrate judge handled all proceedings below. For readability, we refer to the lower court as the district court.

§§ 1011–1015, to restore the states' preeminent position in insurance regulation. *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993); *Life Partners, Inc. v. Morrison*, 484 F.3d 284, 292 (4th Cir. 2007). Typically, of course, the Supremacy Clause of the United States Constitution requires that a state law yield to a conflicting federal law. *See* U.S. Const. art. VI, cl. 2; *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1266 (2012). The McCarran-Ferguson Act, however, "transformed the legal landscape by overturning the normal rules of pre-emption." *Fabe*, 508 U.S. at 507.

The Act first declares that congressional silence "shall not be construed to impose any barrier" to state regulation or taxation of the business of insurance. 15 U.S.C. § 1011. It further provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." *Id.* § 1012(b). Thus, McCarran-Ferguson authorizes "reverse preemption" of generally applicable federal statutes by state laws enacted for the purpose of regulating the business of insurance. *See Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 720 (5th Cir. 2009) (en banc), *cert. denied*, 131 S. Ct. 65 (2010).

B.

While Congress acted to preserve the states' dominance in insurance regulation, it moved to federalize policy regarding arbitration. In 1925, Congress enacted the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, which established a liberal federal policy in favor of the enforcement of arbitration agreements in maritime and commercial contracts. *See CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 668–69 (2012). Although the original version of the FAA protected the enforceability of domestic arbitration agreements, it did not ensure that courts would enforce agreements to arbitrate

in foreign tribunals or awards granted by such tribunals. For this, the United States entered into a multilateral treaty guaranteeing the reciprocal enforcement of such arbitration agreements and awards.

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention), *adopted* June 10, 1958, 21 U.S.T. 2517 (entered into force with respect to the United States Dec. 29, 1970), was crafted during a 1958 United Nations conference. *See* Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1059–60 (1961).

The Convention obligates signatories (1) to recognize and enforce written agreements to submit disputes to foreign arbitration and (2) to enforce arbitral awards issued in foreign nations. *See id.* arts. I–III. Article II of the Convention describes signatories' responsibilities with respect to the enforcement of foreign arbitration agreements as follows:

> 1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> . . . .
>
> 3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

*Id.* art. II. Article III addresses signatories' obligations to enforce foreign arbitral awards. It states that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III. In contrast with Article II, Article III omits an express instruction to courts to enforce these awards.

The United States, although a participant in the drafting conference, did not immediately accede to the Convention. *See* Quigley, *supra*, at 1059–60, 1074. Rather, the Senate gave its advice and consent to accession in 1968, and President Nixon approved the accession in September 1970. Presidential Proclamation on the United States of America's Accession to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Presidential Proclamation), 1970 WL 104417, at *5 (Dec. 11, 1970). The Convention entered into force in the United States on December 29, 1970.[2] *Id.*

According to contemporaneous legislative materials, this delay occurred because "the American delegation [to the drafting conference] felt certain provisions of the [C]onvention were in conflict with some of our domestic laws." S. Exec. Rep. No. 90-10, at 1 (1968). Thus, the President and Congress believed that "[c]hanges in the Federal Arbitration Act (title 9 of the United States Code) [were] required before the United States bec[ame] party to the [C]onvention." *Id.* at 2; *see also* H.R. Rep. No. 91-1181 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3601, 3602 ("Even

---

[2]The United States ultimately acceded to the Convention with two reservations: (1) it would apply the Convention on a reciprocal basis, and (2) it would apply the Convention only to "legal relationships . . . which are considered as commercial" under United States law. Presidential Proclamation, *supra*, at *5. The parties agree that neither reservation bars the application of the Convention in the present action.

though the Convention was approved in October 1968, the instrument of accession will not be deposited until [chapter 2 of the FAA] is enacted into law."). Specifically, a representative of the State Department's Office of the Legal Advisor requested changes to the United States Code "to insure the coverage of the [FAA] extends to all cases arising under the treaty and some changes in Federal civil procedure to take care of related venue and jurisdictional requirement problems." S. Exec. Rep. No. 90-10, at 5–6 (statement of Richard D. Kearney).

To address these concerns and to aid in the enforcement of the Convention, Congress enacted chapter 2 of the FAA (the Convention Act). The first section of this chapter states, "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." 9 U.S.C. § 201. The Convention Act then clarifies that arbitration agreements and awards arising out of commercial relationships, unless they are entirely between United States citizens and have no "reasonable relation with one or more foreign states," fall under the Convention. *Id.* § 202.

Sections 203 through 205 provide rules regarding jurisdiction and venue. Notably, § 203 grants federal district courts original jurisdiction over any "action or proceeding falling under the Convention," and § 205 allows a defendant to "remove such action or proceeding" from state court to federal district court. *Id.* §§ 203, 205. Other provisions of the Convention Act permit federal district courts to "direct that arbitration be held" and "appoint arbitrators" in accordance with the parties' agreement, *id.* § 206, and to confirm foreign arbitral awards falling under the Convention, *id.* § 207.

## C.

Like federal policy, South Carolina policy favors arbitration. *Grant v. Magnolia Manor-Greenwood, Inc.*, 678 S.E.2d

435, 437 (S.C. 2009). South Carolina law establishes that, in general, written arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." S.C. Code Ann. § 15-48-10(a). But this rule does "not apply to . . . any insured or beneficiary under any insurance policy." *Id.* § 15-48-10(b)(4).

In analyzing the enforceability of domestic arbitration agreements in insurance policies, both the United States District Court for the District of South Carolina and the South Carolina Court of Appeals have held that, pursuant to the McCarran-Ferguson Act, South Carolina's law invalidating arbitration agreements in insurance policies reverse preempts chapter 1 of the FAA, 9 U.S.C. §§ 1–16, which governs domestic arbitration. *E.g.*, *Am. Health & Life Ins. Co. v. Heyward*, 272 F. Supp. 2d 578, 582–83 (D.S.C. 2003); *Cox v. Woodmen of the World Ins. Co.*, 556 S.E.2d 397, 399–402 (S.C. Ct. App. 2001). ESAB Group's appeal presents the concomitant question with respect to the Convention and Convention Act: does the McCarran-Ferguson Act apply such that state law can reverse preempt federal law and invalidate a foreign arbitration agreement?

## II.

### A.

ESAB Group is a South Carolina-based manufacturer of welding materials and equipment. During the time period relevant to this appeal, it has had several foreign corporate parents. From 1989 to 1994, ESAB Group and its predecessors operated as subsidiaries of ESAB AB, a Swedish company. In 1994, ESAB Group became an indirect subsidiary of Charter plc, a British company. It remained as such until October 2008, when it became an indirect subsidiary of Charter International plc, an Irish company. Throughout this time, ESAB Group has maintained its principal place of business in Flor-

ence, South Carolina, where it has a manufacturing plant, executive offices, and sales, engineering, and research development divisions.

Between 1989 and 1996, a Swedish insurer, Trygg-Hansa, issued seven global liability policies (the ZIP Policies or the Policies) to ESAB Group's Swedish parent, ESAB AB. Under these Policies, Trygg-Hansa agreed to provide coverage, either as direct primary coverage or in excess of primary policies, to ESAB AB and its subsidiaries. Special endorsements in the Policies specifically extended coverage to ESAB Group and its predecessors. And according to the Policy Territory clauses contained in each Policy, the Policies applied to occurrences "worldwide."

Five of the Policies, the 1989–1993 ZIP Policies, contain arbitration agreements, which mandate the resolution of disputes in Swedish arbitral tribunals in accordance with Swedish law. The other Policies, the 1994–1995 ZIP Policies, include Swedish choice-of-law provisions but omit arbitration clauses.

Trygg-Hansa transferred its obligations under the ZIP Policies to Zurich Insurance Company through a 1998 loss portfolio transfer agreement. Zurich Insurance Company then transferred these obligations to ZIP, an Irish insurer, in 2005.

B.

ESAB Group is currently facing numerous products liability suits arising from alleged personal injuries caused by exposure to welding consumables manufactured by ESAB Group or its predecessors. These suits presently are proceeding in numerous state and federal courts in the United States. As of June 12, 2009, ESAB Group had incurred more than $54 million in defense costs and suffered adverse verdicts in excess of $25 million.

ESAB Group requested that its insurers defend and indemnify it in these products liability actions. Several, including ZIP, refused coverage. As a result, ESAB Group brought suit against these insurers in South Carolina state court.[3]

The defendant insurers removed the case to the United States District Court for the District of South Carolina pursuant to the Convention and the Convention Act's grant of removal jurisdiction. ESAB Group disputed the district court's subject-matter jurisdiction. ESAB Group maintained that the Convention Act implements the Convention, so the Convention is judicially enforceable only as incorporated into the Act. And, it continued, the McCarran-Ferguson Act permits South Carolina law, which would invalidate the arbitration clauses in the 1989–1993 ZIP Policies, to reverse preempt the Convention Act. ESAB Group therefore contended that the ZIP Policies did not contain valid arbitration agreements, so they did not fall under the Convention. Thus, according to ESAB Group, the claims were not removable.

ZIP, in turn, challenged the district court's exercise of personal jurisdiction. ZIP emphasized its limited contacts with South Carolina. A ZIP representative attested that ZIP maintains no offices or other facilities in South Carolina, owns no property there, is not licensed as an insurer by South Carolina, and does not regularly conduct business in the state. Although the ZIP Policies extended coverage to ESAB Group, ZIP argued this was an insufficient basis for personal jurisdiction because the contracts were negotiated, drafted, and executed in Sweden by two Swedish companies, ESAB AB and Trygg-Hansa.

The district court rejected both parties' contentions. As to

---

[3]Trygg-Hansa and Zurich Insurance Company were among the initial defendants in this action. But after ZIP agreed to assume all obligations under the ZIP Policies, the parties agreed to the dismissal of Trygg-Hansa and Zurich Insurance Company.

the issue of subject-matter jurisdiction, the district court acknowledged a split amongst our sister circuits concerning the interaction between the Convention, the Convention Act, and the McCarran-Ferguson Act. After considering the relevant precedent, the district court adopted the position of the Fifth Circuit, articulated in *Safety National*, 587 F.3d 714. Under this reasoning, it found that "the Convention, not the Convention Act, . . . directs courts to enforce international arbitration agreements," and because the McCarran-Ferguson Act's text limits its scope to federal statutes, McCarran-Ferguson could not disrupt the application of traditional preemption rules.

The district court then found that ZIP had the requisite minimum contacts with the forum to permit the exercise of personal jurisdiction and that the exercise of jurisdiction over ZIP was otherwise reasonable. After concluding it had jurisdiction over both the subject matter and parties to the action, the district court enforced the arbitration agreements. It referred claims pertaining to the 1989-1993 ZIP Policies to arbitration.[4]

Because it had referred to arbitration all claims providing a basis for subject-matter jurisdiction, the district court declined to exercise supplemental jurisdiction over the

---

[4]ZIP argued before the district court that the claims regarding coverage under the 1994–1995 ZIP Policies were also arbitrable pursuant to the clauses in the earlier contracts. The district court rejected this contention and declined to send these claims to arbitration. ZIP initially raised this issue in its cross-appeal.

While the instant action was proceeding in the state and federal courts below, ZIP brought suit in Stockholm District Court to compel arbitration. The Swedish Court referred claims under all of the ZIP policies, including the 1994–1995 Policies, stating that it was "not evident that there [were] no legal grounds for arbitration" of these claims. The Swedish arbitral panel handling this matter subsequently dismissed for lack of jurisdiction the claims related to the 1994–1995 ZIP Policies. As a result, ZIP has withdrawn this aspect of its cross-appeal, and we do not consider it here.

remaining claims. It remanded the claims relating to the 1994–1995 ZIP Policies to state court.

ESAB Group timely appealed the district court's exercise of subject-matter jurisdiction. ZIP filed a cross-appeal, challenging the district court's exercise of personal jurisdiction and its authority to remand the nonarbitrable claims to state court.

III.

We first consider whether the federal courts have jurisdiction over the present action or whether, as ESAB Group claims, South Carolina law reverse preempts federal law and eliminates the basis for jurisdiction. Our review of questions of subject-matter jurisdiction is de novo. *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 815 (4th Cir. 2004) (en banc).

ESAB Group asserts that the Convention is a non-self-executing treaty, i.e., one that requires implementing legislation to be given effect in domestic courts. According to ESAB Group, it follows from this that the Convention has legal effect only as incorporated into its implementing legislation—here, the Convention Act. And because the Convention Act is a federal statute that does not speak directly to insurance, ESAB contends, it is subject to reverse preemption under the McCarran-Ferguson Act.

A.

Two of our sister circuits, the Second and the Fifth, have examined whether a state law may preempt the Convention or Convention Act pursuant to the McCarran-Ferguson Act and have reached divergent conclusions.

The Second Circuit visited the issue in *Stephens v. American International Insurance Co.*, 66 F.3d 41 (2d Cir. 1995). Citing only the Convention Act, the *Stephens* court stated,

"[T]he Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation." *Id.* at 45. The court then framed the question as whether the implementing legislation, the Convention Act, is subject to preemption by state law under the McCarran-Ferguson Act. *See id.* ("The Convention itself is simply inapplicable in this instance."). Based on the text of the McCarran-Ferguson Act, the court concluded, without elaboration, that state laws precluding arbitration of disputes with a delinquent insurer reverse preempt the Convention Act. *Id.*

The Second Circuit soon called its holding into question, however. In *Stephens v. National Distillers & Chemical Corp.*, 69 F.3d 1226 (2d Cir. 1995), the court held that the McCarran-Ferguson Act did not apply to the Foreign Sovereign Immunities Act (FSIA), so the FSIA could preempt New York insurance law. *See id.* at 1231. It based this decision, in part, on clear congressional intent for the FSIA to preempt all contrary state law. *See id.* at 1232–34. Although the court noted in a footnote that this reasoning might apply to the Convention Act, in conflict with its earlier decision, it declined to consider the potential conflict at that time. *See id.* at 1233 n.6.

The Fifth Circuit, sitting en banc, took up the issue of the interaction between the McCarran-Ferguson Act and the Convention in *Safety National*. The majority in that case held that, even assuming the Convention was non-self-executing (and therefore did not have legal effect in domestic courts absent implementing legislation), reverse preemption did not apply. *See Safety Nat'l*, 587 F.3d at 722–23. The majority first reasoned that the McCarran-Ferguson Act applied only to statutes, not treaties. *See id.* at 718 ("Congress did not intend to include a treaty within the scope of an 'Act of Congress' when it used those words in the McCarran-Ferguson Act."). It then concluded that, despite the presence of implementing legislation, the Convention, not the Convention Act, was being "construe[d]" to supersede state law. *Id.* at 718, 724–25. And because the McCarran-Ferguson Act did not apply to

treaties, that Act could "not cause [state law] to reverse-preempt the Convention." *Id.* at 732.

Judge Elrod, joined by two other judges, provided a strident dissent. She too assumed that the treaty was non-self-executing, finding that the parties failed to preserve this issue. *See id.* at 751 n.31 (Elrod, J., dissenting). But she observed that, as to non-self-executing treaties, "commentators over-whelmingly conclude that under current (and longstanding) law, it is only the implementing statute, not the non-self-executing treaty, that can be enforced by the courts so as to be capable of preemption." *Id.* at 741–42 (citing sources). And because only the implementing legislation had preemp-tive effect, it was a statute—the Convention Act—that was being construed to supersede state law. *See id.* at 748.

The dissent charged that the majority had misconstrued the appropriate inquiry by analyzing whether a treaty was an "Act of Congress" for purposes of McCarran-Ferguson; Judge Elrod agreed it was not. *See id.* at 737, 747. She further claimed that the majority had engaged in a "play on words" in finding that the Convention itself was being "'construed' under the McCarran-Ferguson Act" to supersede state law. *Id.* at 747. The Convention, as a non-self-executing treaty, was not judicially enforceable, so it lacked the power to preempt (or supersede) state law. *Id.* at 746. Instead, the dissent argued, the Convention Act, which incorporated the Conven-tion by reference, must be the source of the potentially pre-emptive federal law to which McCarran-Ferguson's reverse-preemption rule might apply. *Id.* The proper question, accord-ing to the dissent, was whether the Convention Act was an "Act of Congress" within the meaning of McCarran-Ferguson, *id.* at 748, and the dissenters would have held that it was, *id.* at 749.

Judge Clement concurred in the judgment but rejected the majority's analysis. *See id.* at 732–33 (Clement, J., concurring in the judgment). The dissent, she asserted, had "persuasively

refute[d]" the majority's position that the provisions of a non-self-executing, implemented treaty "have full preemptive effect." *Id.* at 733. Judge Clement argued that the court should instead have found that Article II of the Convention was self-executing based on its plain-language directive to domestic courts to enforce foreign arbitral agreements. *See id.* at 733–34. Although she acknowledged that some factors indicated the Convention Act was intended as implementing legislation, she believed these were better explained by reading other portions of the Convention, particularly Article III, as non-self-executing. *See id.* at 736–37. If Article II was self-executing, then the treaty itself preempted state law, and the McCarran-Ferguson Act, applicable only to statutes, could not disrupt the traditional rules of preemption. *See id.* at 737.

B.

ZIP presents numerous arguments in support of its position that the McCarran-Ferguson Act does not authorize reverse preemption in this case. First, we quickly reject ZIP's contention that the South Carolina statute is not subject to McCarran-Ferguson because it is not a "law enacted . . . for the purpose of regulating the business of insurance." The Supreme Court has instructed that this category of laws is a "broad" one, encompassing "laws that possess the end, intention, or aim of adjusting, managing, or controlling the business of insurance." *Fabe*, 508 U.S. at 505 (quoting *Black's Law Dictionary* 1236, 1286 (6th ed. 1990)) (internal quotation marks omitted). We agree with the district court and the South Carolina Court of Appeals that South Carolina's law, which governs the manner in which disputes regarding coverage are resolved, falls within this category. *See Heyward*, 272 F. Supp. 2d at 582–83; *Cox*, 556 S.E.2d at 399–402.

The parties also spill significant ink disputing whether Article II of the Convention is a self-executing treaty provision. Chief Justice Marshall first delineated the distinction between a self-executing and non-self-executing treaty in *Foster v.*

*Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829), *overruled on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833). He wrote that, because the Constitution establishes that treaties are the supreme law of the land, a court should regard a treaty as "equivalent to an act of the legislature," provided that "it operates of itself, without the aid of any legislative provision" (i.e., it is self-executing). *Id.*; *see also Medellin v. Texas*, 552 U.S. 491, 505–06 (2008) ("Only '[i]f the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, [will] they have the force and effect of a legislative enactment.'" (alterations in original) (quoting *Whitney v. Robertson*, 124 U.S. 190, 194 (1888))). But if "the treaty addresses itself to the political, not the judicial department," Chief Justice Marshall directed, it is non-self-executing, and "the legislature must execute the contract, before it can become a rule for the court." *Foster*, 27 U.S. at 314. It is well-established that a treaty may "contain both self-executing and non-self-executing provisions." *Lidas, Inc. v. United States*, 238 F.3d 1076, 1080 (9th Cir. 2001); *see also United States v. Postal*, 589 F.2d 862, 884 n.35 (5th Cir. 1979).

ZIP asserts that Article II of the Convention is self-executing and, therefore, should be enforced and given preemptive effect independent of the Convention Act. There is much to recommend this position. Most notably, the starting point of treaty interpretation is the text, *Medellin*, 552 U.S. at 506, and the text of Article II instructs domestic courts to enforce foreign arbitral agreements. The Supreme Court has signaled that this sort of "directive to domestic courts" is indicative of a self-executing treaty provision. *Id.* at 508. Judge Clement, in her *Safety National* concurrence, *see* 587 F.3d at 734–35, and the United States, in opposing the petition for certiorari in that case, *see* Brief for United States as Amicus Curiae at 9, *La. Safety Ass'n of Timbermen Self Insurers Fund v. Certain Underwriters at Lloyd's, London*, 131 S. Ct. 65 (2010) (No. 09-945), 2010 WL 3375626, adopted the

view that the instructive language in Article II rendered it self-executing.

But, as Judge Clement noted, there is an emerging presumption against finding treaties to be self-executing. *See Safety Nat'l*, 587 F.3d at 737. And the legislative history of the Convention Act indicates that Congress viewed the Act as implementing legislation, at least as to some of the Convention's provisions. *See* S. Exec. Rep. No. 90-10, at 5–6 (statement of Richard D. Kearney) (referring to the proposed changes to the FAA as "implementing legislation"); H.R. Rep. No. 91-1181, *reprinted in* 1970 U.S.C.C.A.N. 3601, 3603 (same). *Medellin*, furthermore, cited the Convention Act as an example of implementing legislation. 552 U.S. at 521. Although Judge Clement urged that the Convention Act served to implement other provisions of the Convention (particularly Article III), *see Safety Nat'l*, 587 F.3d at 736–37, this is hardly clear because nothing in the Convention Act or legislative history differentiates between Article II and the remainder of the treaty.

Moreover, the question of what constitutes a self-executing treaty has long confused courts and commentators. *See Postal*, 589 F.2d at 876 ("The self-execution question is perhaps one of the most confounding in treaty law."); Curtis A. Bradley, *Intent, Presumptions, and Non-Self-Executing Treaties*, 102 Am. J. Int'l L. 540, 540 (2008) ("[B]oth the theory behind the self-execution doctrine and its mechanics have long befuddled courts and commentators."). Indeed, scholars and jurists continue to debate the proper means for determining a treaty's status. *See, e.g.*, *Igartua v. United States*, 626 F.3d 592, 623 (1st Cir. 2010) (Torruella, J., concurring in part and dissenting in part) (urging a predominantly textual approach); David L. Sloss, *Executing Foster v. Neilson: The Two-Step Approach to Analyzing Self-Executing Treaties*, 53 Harv. Int'l L.J. 135 (2012); Carlos Manuel Vazquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695 (1995).

But we need not wade into these murky waters to resolve the question before us. To the contrary, we hold that, even assuming Article II of the Convention is non-self-executing, the Convention Act, as implementing legislation of a treaty, does not fall within the scope of the McCarran-Ferguson Act. Instead, as detailed below, Supreme Court precedent dictates that McCarran-Ferguson is limited to legislation within the domestic realm, and prior precedent of this court and our sister circuits supports a narrow reading of the Act.

Our aim in analyzing the McCarran-Ferguson Act, as in all matters of statutory interpretation, is to implement Congress's intent. *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010). We do so by examining the text of the statute, and absent clear congressional intent to the contrary, we will give the statute its plain meaning. *Id.*; *see also Stephens ex rel. R.E. v. Astrue*, 565 F.3d 131, 137 (4th Cir. 2009) ("In interpreting the plain language of a statute, we give the terms their 'ordinary, contemporary, common meaning, absent an indication Congress intended [them] to bear some different import.'" (quoting *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008))).

Where a statute touches upon foreign relations and the United States' treaty obligations, we must proceed with particular care in undertaking this interpretive task. As the Supreme Court observed in considering a prior potential conflict between the Convention Act and a federal statute, "[i]f the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995). We seek, when possible, to "construe . . . statute[s] consistent with our obligations under international law." *Kofa v. U.S. INS*, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc) (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

ESAB Group urges that we must construe "Act of Congress," as that term is used in the McCarran-Ferguson Act, to apply to every federal statute, irrespective of the international implications. But the Supreme Court has recently explained that, in enacting the McCarran-Ferguson Act, Congress plainly did not intend the law to apply so broadly. In *Garamendi*, the Supreme Court specified that McCarran-Ferguson was "directed to implied preemption by domestic commerce legislation." 539 U.S. at 428; *see also id.* ("As the text itself makes clear, the point of McCarran–Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised.").

Although in *Garamendi* the Court was examining the interaction between state law and an executive agreement, the Court's statements regarding congressional intent guide our understanding of Congress's intent to limit the Act's scope. Specifically, that case demonstrated that Congress did not intend for the McCarran-Ferguson Act to permit state law to vitiate international agreements entered by the United States. *Cf. FTC v. Travelers Health Ass'n*, 362 U.S. 293, 300 (1960) (stating that McCarran-Ferguson was not intended to permit a state to "regulate activities carried on beyond its own borders"), *cited in Garamendi*, 539 U.S. at 428.

On several occasions, moreover, Courts of Appeals have refused to give the McCarran-Ferguson Act the broad scope urged by ESAB Group. For example, we have previously expressed our skepticism that Congress intended the McCarran-Ferguson Act to apply to statutes governing federal subject-matter jurisdiction. *Gross v. Weingarten*, 217 F.3d 208, 222 (4th Cir. 2000). And several of our sister circuits have joined in this view or held that such statutes are not subject to reverse preemption. *See Safety Nat'l*, 587 F.3d at 724 n.39 (expressing skepticism); *Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Ill.*, 421 F.3d 835, 843–44 (9th Cir. 2005) (holding that the diversity jurisdiction statute "is not reverse-

preempted"), *amended* 433 F.3d 1089 (9th Cir. 2006); *Martin Ins. Agency, Inc. v. Prudential Reinsurance Co.*, 910 F.2d 249, 254 (5th Cir. 1990) (holding that the McCarran-Ferguson Act "did not remove diversity jurisdiction from the federal courts in insurance matters"); *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 702–03 (10th Cir. 1988) (finding no preemption of diversity jurisdiction statute).

The Second Circuit has found several substantive statutes outside of McCarran-Ferguson's reverse-preemption rule. It first held that the McCarran-Ferguson Act could not permit state law to exempt an insurer from compliance with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1064–66 (2d Cir. 1982), *vacated*, 463 U.S. 1223, *remanded to* 735 F.2d 23 (2d Cir. 1984). *But see Murff v. Prof'l Med. Ins. Co.*, 97 F.3d 289, 292 n.4 (8th Cir. 1996) (questioning *Spirt*'s holding); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 294–95 (7th Cir. 1992) (same). It reasoned that Title VII's "broad and explicit pre-emptive provision" evinced congressional intent to displace all contrary state laws. *Spirt*, 691 F.2d at 1065.

Likewise, as noted previously, the Second Circuit subsequently held that McCarran-Ferguson's reverse-preemption rule was inapplicable to the FSIA. *Nat'l Distillers*, 69 F.3d at 1231. The "international-law origins of the FSIA," it declared, were "so different from the kind of congressional statutory action that the McCarran-Ferguson Act was enacted to deal with," that they "virtually compel[led] the conclusion" that the McCarran-Ferguson Act did not authorize state law to displace the FSIA. *Id.* In addition, it concluded that the McCarran-Ferguson Act did not alter the rules of preemption "so drastically as to force a federal law that clearly intends to preempt all other state laws to give way simply because the

insurance industry is involved." *Id.* at 1233. And it found that the FSIA evidenced such an intent.[5] *Id.* at 1232.

The Convention Act, which provides, without exception, that the Convention "shall be enforced in United States courts," 9 U.S.C. § 201, similarly intends to replace all contrary state laws. The Supreme Court has opined that the Convention and Convention Act demand that courts "subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 639 (1985). Thus, although the Court acknowledges that the Convention permits Congress to "specify categories of claims it wishes to reserve for decision by our own courts," it has "decline[d] to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so." *Id.* at 639 n.21.

The McCarran-Ferguson Act contains no such express direction.[6] Indeed, the Supreme Court has told us that the aim of McCarran-Ferguson is not arbitration or treaties, but "domestic commerce legislation." *Garamendi*, 539 U.S. at 428. We therefore hold that the Convention Act, as legislation implementing a treaty, is not subject to reverse preemption, so insurance disputes are not exempt from the Convention Act pursuant to McCarran-Ferguson's reverse-preemption rule.

---

[5]As we recounted above, the *National Distillers* panel acknowledged that its decision was in tension with the Second Circuit's earlier decision in *Stephens v. American International* because this reasoning might also apply to the Convention Act, but it found no need to revisit that holding in the case before it. *See Nat'l Distillers*, 69 F.3d at 1233 n.6.

[6]Of course, to the extent the McCarran-Ferguson Act and Convention Act are in irreconcilable conflict, the more recent Convention Act would prevail. *See Branch v. Smith*, 538 U.S. 254, 273 (2003); *cf. Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (establishing that if a self-executing treaty and statute are inconsistent, "the one last in date will control the other").

As we have observed, the federal government must be permitted to "speak with one voice when regulating commercial relations with foreign governments." *Michelin Tire Corp.*, 423 U.S. at 285. With the Convention and Convention Act, the government has opted to use this voice to articulate a uniform policy in favor of enforcing agreements to arbitrate internationally, even when "a contrary result would be forthcoming in a domestic context." *Mitsubishi Motors*, 473 U.S. at 629. To allow "parochial refusal[s]" to enforce foreign arbitration agreements would frustrate the very purposes for which the Convention was drafted: achieving the predictable and orderly resolution of disputes "essential to any international business transaction" and ensuring parties are not haled into hostile or inappropriate forums. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516–17 (1974); *see also Mitsubishi Motors*, 473 U.S. at 639 n.21.

Congress might opt to exclude insurance disputes from the Convention. But it has not done so with the McCarran-Ferguson Act. Nothing in McCarran-Ferguson suggests that, by enacting that statute, Congress intended to delegate to the states the authority to abrogate international agreements that this country has entered into and rendered judicially enforceable. We will not read it to do so.

Because the Supreme Court has made clear that McCarran-Ferguson is limited to domestic affairs, we hold the Convention Act falls outside of its scope.[7] Hence, we affirm the district court's exercise of subject-matter jurisdiction.

---

[7]This is not to say that, in enacting the McCarran-Ferguson Act, Congress merely "'turn[ed] back the clock' to the time prior to *South-Eastern Underwriters*"; the Court has made clear that it did not. *Fabe*, 508 U.S. at 506–08. We recognize that, within the domestic context, McCarran-Ferguson broadly empowered states to tax and regulate insurance. *Id.* at 508. Here, we are simply heeding the Court's instruction in *Garamendi* that McCarran-Ferguson did not extend states' authority over foreign affairs or allow them "to regulate activities carried on beyond [their] own borders." 539 U.S. at 428 (quoting *Travelers Health Ass'n*, 362 U.S. at 300) (internal quotation marks omitted).

In addition, as the 1989–1993 ZIP Policies contain valid arbitration clauses subject to the Convention and Convention Act, we find the district court properly compelled arbitration in Sweden of ESAB Group's claims under these Policies.

IV.

Having established that the district court had jurisdiction over the subject matter of this action, we now consider the issues presented by ZIP's cross-appeal.

A.

ZIP avers that the district court lacked personal jurisdiction over it. It notes that it maintains no office, employees, or agents in South Carolina, and it owns no property there. It further stresses that the ZIP Policies were executed outside of the United States between foreign companies, and these contracts designate Swedish law for the resolution of disputes. Thus, ZIP urges that, although the ESAB Group and its predecessors were covered under the ZIP Policies, its contacts with the state are too weak to provide a basis for jurisdiction and that the exercise of jurisdiction is otherwise unreasonable.

We review de novo the exercise of personal jurisdiction over a defendant, although we accept the district court's underlying factual findings absent clear error. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). The plaintiff bears the burden to make a prima facie showing of a basis for jurisdiction. *Id.*

In general, "[a] federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment."[8]

---

[8]At oral argument, counsel for ESAB Group suggested that we should consider ZIP's contacts with the United States, rather than its South Caro-

*Id.* at 277. Because the scope of South Carolina's long-arm statute is coextensive with the Due Process Clause, *see Cockrell v. Hillerich & Bradsby Co.*, 611 S.E.2d 505, 508 (S.C. 2005), we proceed directly to the constitutional analysis, *see ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).

We employ a three-part inquiry to determine whether the exercise of specific jurisdiction over a party comports with due process. *Consulting Eng'rs*, 561 F.3d at 278. Under this test, "we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)) (internal quotation marks omitted). We agree with the district court that, as to ZIP, each prong of this test is satisfied.

To meet the first prong, the court must find that the defendant has established "minimum contacts" with the forum state by "purposefully avail[ing itself] of the privilege of conducting business under the [state's] laws." *Id.* A defendant's actions that are directed at the forum state in only "a random, fortuitous, or attenuated way" are insufficient to support jurisdiction. *ESAB Grp.*, 126 F.3d at 625. Thus, the Supreme Court has rejected the exercise of jurisdiction where a defendant has merely placed a product into the stream of commerce

lina contacts. But because we conclude that ZIP would be subject to jurisdiction in a court of general jurisdiction in South Carolina, as required for jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(A), we need not consider ZIP's nationwide contacts. *See CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009) (declining to analyze the possibility of jurisdiction based on nationwide contacts pursuant to Federal Rule of Civil Procedure 4(k)(2) because Rule 4(k)(1)(A) authorized jurisdiction).

foreseeing that it might ultimately reach the forum state. *See J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2785 (2011) (plurality opinion). But where a defendant has "targeted the forum" with its goods, sufficient contacts exist. *Id.* at 2788.

In *Rossman v. State Farm Mutual Automobile Insurance Co.*, 832 F.2d 282, 286–87 (4th Cir. 1987), we identified unique aspects of the business of insurance relevant to the evaluation of an insurer's contacts with a forum. Litigation, we observed, is often a necessary part of the insurance business. *Id.* at 286. Therefore, by agreeing to furnish a defense to its policyholder within a specified policy territory, an insurer indicates its willingness to be haled into court in foreign forums within this territory. *Id.* And because the insurer offers "broad coverage to induce customers to buy its policies and to pay higher premiums for them," these contacts "are neither fortuitous nor incidental." *Id.* at 287. Based on these principles, we determined in *Rossman* that a district court in Virginia could exercise jurisdiction over a foreign insurer based on an automobile liability insurance contract written, issued, and delivered in Illinois, because the contract's policy territory included Virginia. *See id.* at 286–87.

Not only do the ZIP Policies[9] include South Carolina in the policy territory, which is worldwide, but the Policies also identify as covered insureds ESAB Group and its predecessors, companies based in South Carolina. We infer that ZIP obtained financial benefits, in the form of higher premiums, for agreeing to provide this coverage. These facts demonstrate that ZIP targeted the forum state and purposefully availed

---

[9]It is of no moment that Trygg-Hansa, rather than ZIP, originated these Policies. In agreeing to assume Trygg-Hansa's obligations under the ZIP Policies, ZIP knowingly entered into an agreement to defend ESAB Group, a company headquartered in South Carolina, in courts throughout the world. Thus, ZIP's successor status does not lessen its contacts with the state.

itself of the privilege of conducting business under South Carolina law. Accordingly, the first prong, minimum contacts, is satisfied. The parties also agree that the suit arises out of these contacts, fulfilling the second prong.

The third prong, constitutional reasonableness, protects a party from "litigation 'so gravely difficult and inconvenient' that [the] party unfairly is at a 'severe disadvantage' in comparison to [its] opponent." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). To defeat jurisdiction on this basis, a defendant must establish, despite the presence of minimum contacts, "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477.

It is clear that the burden on ZIP of litigating in South Carolina is not so great—particularly in relation to the interests of South Carolina and of ESAB Group—to render the exercise of jurisdiction unreasonable. We are cognizant that requiring a party to defend itself in a "foreign legal system" imposes "unique burdens" that "should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Consulting Eng'rs*, 561 F.3d at 282 n.12 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 114 (1987)) (internal quotation marks omitted). But in contracting to defend ESAB Group worldwide, ZIP indicated that the burden of appearing in a forum in South Carolina is not exceedingly onerous. *See Rossman*, 832 F.2d at 287.

In contrast, South Carolina "has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *McGee*, 355 U.S. at 223. And ESAB Group, as a company based in South Carolina and facing litigation throughout the United States, has a substantial interest in the convenience of litigating in South Carolina.

*Foster v. Arletty 3 SARL*, 278 F.3d 409 (4th Cir. 2002), cited by ZIP, does not dictate otherwise. In that case, Foster, a French citizen, first sought relief in France, and he brought suit in South Carolina only after the French courts issued an adverse decision. *See id.* at 416. Thus, Foster, unlike ESAB Group, could not show that South Carolina was his forum of choice, and it was clearly convenient for Foster to litigate in France. *See id.*

We will affirm the district court with respect to personal jurisdiction.

### B.

The Convention Act provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States," and it grants federal district courts "original jurisdiction over such an action or proceeding." 9 U.S.C. § 203. Seizing on this language, ZIP contends that the district court had original jurisdiction over all claims against it in this action, regardless of whether each claim involved a contract containing a foreign arbitral agreement. Thus, it argues that the court erred when, after referring the claims pertaining to the 1989–1993 ZIP Policies to arbitration, it exercised its discretion under 28 U.S.C. § 1367, the statutory grant of supplemental jurisdiction, to remand the remaining, nonarbitrable claims to state court.

We review for abuse of discretion a district court's decision to remand state law claims after declining to exercise supplemental jurisdiction. *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 203 (4th Cir. 1997). Of course, an error of law is, by definition, an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

We find that the district court had authority to decline to exercise jurisdiction over the nonarbitrable claims and to

remand these claims to state court. Although § 203 refers to jurisdiction over an "action or proceeding," the statutory grant of federal-question jurisdiction, 28 U.S.C. § 1331, similarly confers upon district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Notwithstanding the potential breadth of this language, the Supreme Court has interpreted § 1331 to require supplemental jurisdiction (or its antecedents) over certain claims within a constitutional case that do not themselves give rise to federal jurisdiction.

In *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), the Court articulated the theory of pendent jurisdiction, the precursor to supplemental jurisdiction, by adopting an "expansive interpretive approach" to § 1331. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005). Under this approach, so long as one claim in an action presented a federal question on the face of the well-pleaded complaint, a court could exercise jurisdiction over the entire constitutional case or controversy. *See id.* at 552–53. It does not follow, however, that the federal court had original jurisdiction over the entire case; rather, it had original jurisdiction over at least one claim, allowing the exercise of supplemental/pendent jurisdiction over the remaining claims. And the Supreme Court subsequently recognized that, when the exercise of pendent jurisdiction over these claims became "inappropriate," district courts had inherent authority to remand them to state courts. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988).

With 28 U.S.C. § 1367, Congress largely codified the doctrine of pendent jurisdiction (and the related doctrine of ancillary jurisdiction) as supplemental jurisdiction. *See* § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."). Section 1367(c)

recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including, as occurred here, where the court dismisses the claims over which it has original jurisdiction. *Id.* § 1367(c); *see also Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001). And we have held that district courts retain inherent authority, once they have decided under § 1367(c) not to exercise jurisdiction, to remand these claims to state court. *Hinson*, 239 F.3d at 616–17.

In light of this history, we read § 203 to authorize federal jurisdiction over all claims within an action, but, as to those claims not falling under the Convention, this jurisdiction is supplemental in nature. And when those claims falling within a court's original jurisdiction are no longer in the case—here, because they have been referred to arbitration—the court has authority under § 1367(c) to decline to exercise such supplemental jurisdiction and inherent authority to remand the remaining claims to state court. Thus, the district court committed no error of law in finding it had authority to do so here.

Nor did the district court abuse its discretion in exercising this authority. ZIP urges that 9 U.S.C. § 3 obligated the district court to stay the remaining claims pending arbitration. But we have held that, as to nonarbitrable claims, the decision to stay under § 3 is discretionary. *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 97 (4th Cir. 1996). Although a district court may be compelled to stay nonarbitrable issues within an otherwise arbitrable claim, *see Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 376 & n.18 (4th Cir. 2012), there is no like requirement that the court exercise supplemental jurisdiction over nonarbitrable claims where all claims within the court's original jurisdiction have been sent to arbitration. Accordingly, the district court was well within the scope of its discretion to remand the nonarbitrable claims in this action.

## V.

For the foregoing reasons, we affirm.

*AFFIRMED*

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Judge Floyd's fine opinion in this case. At oral argument, I expressed the view that appellant's able counsel was leading this court into a nest of "machine gun fire."

Here's why. To hold that the McCarran-Ferguson Act empowers state law to displace the Convention on the Recognition and Enforcement of Foreign Arbitral Awards would (1) ignore the Convention's express statement that contracting states "*shall* recognize an agreement in writing under which the parties undertake to submit to arbitration," and its directive that "[t]he court of a Contracting State . . . *shall*, at the request of one of the parties, refer the parties to arbitration," art. II, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (emphases added); (2) ignore the implementing legislation's instruction that "[t]he Convention . . . *shall* be enforced in United States courts," 9 U.S.C. § 201 (emphasis added), and its conferral of jurisdiction to federal district courts for "action[s] [and] proceeding[s] falling under the Convention," *id.* § 203; (3) require this court to interpret the phrase "Act of Congress," as used in the McCarran-Ferguson Act, to encompass a *treaty*, *see Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 722-23 (5th Cir. 2009); (4) cause a treaty to lose its character as a treaty simply because it has been implemented by federal legislation, *see id.*; (5) contradict *American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003), where the Supreme Court indicated that the McCarran-Ferguson Act "was not intended to allow a State to 'regulate activities carried on beyond its own borders'" and "cannot sensibly be construed to address preemp-

tion by executive conduct in foreign affairs," *id.* at 428 (citation omitted); *see ante* at 20; (6) ignore the intent of Congress, as expressed in the Federal Arbitration Act, to establish a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (citing 9 U.S.C. § 2); (7) ignore the repeated admonitions of the Supreme Court that arbitration provisions are a valid way of resolving international commercial disputes, *see, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638-40 (1985); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516-17 (1974); (8) cause the nation to speak with more than one voice in a matter of international commercial trade by enabling each of the fifty states to employ its own arbitration regime, *see generally Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376-77, 381-82 (2000); (9) cause other nations to doubt this country's commitment to its international covenants; and (10) invite retaliation when an American insurer (or, for that matter, any American company) seeks to enforce an arbitration agreement with an insured (or an agreement that relates to any number of commercial matters) in another country.

One might go on, but there is something to be said for ending at a round number, and so I do here.